# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
   **Plaintiff,**

  v.                **Case No. 07-CR-30**

**ALAN SIMMONS**
   **Defendant.**

## DECISION AND ORDER

Defendant Alan Simmons filed a motion to suppress a witness's out-of-court identification of him from a photograph, as well as the witness's anticipated in-court identification, arguing that the procedures employed in the out-of-court identification were unduly suggestive. I referred the motion to a magistrate judge, who held a hearing then recommended that the motion be denied. Defendant objects, requiring me to review the matter de novo. Fed. R. Crim. P. 59(b)(3).[1]

## I. APPLICABLE LEGAL STANDARDS

### A. Out-of-Court Identification

The Due Process Clause protects a defendant's right to be free from unnecessarily suggestive confrontations. See Stovall v. Denno, 388 U.S. 293, 302 (1967). The court may suppress a pre-trial identification of the defendant if the procedures employed by police were

---

[1] While defendant requests de novo review of the magistrate judge's recommendation, he does not request a de novo hearing. I have reviewed the transcript of the hearing conducted by the magistrate judge and conclude that a new hearing is unnecessary. See United States v. Raddatz, 447 U.S. 667 (1980) (stating that the district judge may, but need not, conduct a de novo hearing on review of a magistrate judge's recommendation).

inherently suggestive and created a substantial likelihood of irreparable misidentification. See Manson v. Braithwaite, 432 U.S. 98, 106 (1977); Neil v. Biggers, 409 U.S. 188, 197 (1972). The court conducts a two-step analysis, asking (1) whether the procedure employed was unreasonably suggestive and (2) if so, whether the identification, viewed under the totality of the circumstances, was reliable despite the suggestive procedures. United States v. Rogers, 387 F.3d 925, 936 (7th Cir. 2004); United States v. Funches, 84 F.3d 249, 253 (7th Cir. 1996). The two inquiries are separate and should be approached sequentially. United States v. Johnson, 859 F.2d 1289, 1294 (7th Cir. 1988); see also United States v. Hawkins, No. 06-2094, 2007 U.S. App. LEXIS 20546, at *9 (7th Cir. Aug. 28, 2007) ("First, the defendant must establish that the identification procedure was unduly suggestive. If the defendant establishes this factor, we then must determine whether, under the totality of the circumstances, the identification was nonetheless reliable.") (internal citation omitted).

In examining the identification procedure, the court focuses "on the manner in which the witness was shown the suspect's likeness, reserving criticism for procedures that have been orchestrated to yield the identification of one particular suspect." United States v. Jones, 454 F.3d 642, 649 (7th Cir.), cert. denied, 127 S. Ct. 690 (2006) (citing Gregory-Bey v. Hanks, 332 F.3d 1036, 1045 (7th Cir. 2003); United States v. Traeger, 289 F.3d 461, 473-74 (7th Cir. 2002)). "For the most part, these suggestive procedures involve the repeated presentation of only one suspect by the police to a witness, or a lineup in which the suspect is clearly distinguishable from the other persons." Id. The most widely condemned pre-trial identification practice is the show-up, where officers show the witness only one suspect, either through a photo or in person. See Stovall, 388 U.S. at 302; Funches, 84 F.3d at 254. Courts have condoned such a procedure only under certain circumstances, such as where the exigencies

2

of the situation demand an immediate identification, if the witness might die before a line-up can be assembled, for instance. See Funches, 84 F.3d at 254; see also Hawkins, 2007 U.S. App. LEXIS 20546, at *10 ("To determine whether, under the circumstances, the suggestive identification was unnecessarily so, we must determine whether there was a good reason for the failure to resort to a less suggestive alternative.").

If the court finds that the identification procedure was unduly suggestive, it must then determine whether, under the totality of the circumstances, the identification was nevertheless reliable. United States v. Newman, 144 F.3d 531, 535 (7th Cir. 1998); see also Neil, 409 U.S. at 198 (stating that the primary evil to be avoided is a very substantial likelihood of irreparable misidentification). In making this determination, the court considers five factors: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness's degree of attention to the perpetrator; (3) the accuracy of the witness's prior description of the perpetrator; (4) the level of certainty demonstrated by the witness when making the identification; and (5) the length of time between the crime and the identification. Jones, 454 F.3d at 649. If on review of these factors the court determines that the identification was reliable despite any suggestive procedures, it should admit testimony of the pre-trial identification.

**B.     In-Court Identification**

Generally, the credibility of a witness's in-court identification of the defendant is an issue for the jury "after the defendant has had an opportunity to test the accuracy of an identification through cross-examination." United States v. Allen, 930 F.2d 1270, 1273 (7th Cir. 1991). The defendant has no right to avoid being identified at trial, despite the suggestiveness of him being the only person seated at the defense table (aside from counsel) while the in-court identification

3

is made.  Rodriguez v. Peters, 63 F.3d 546, 556 (7th Cir. 1995).

However, where the in-court identification follows a previous out-of-court identification that was unduly suggestive, "the in-court identification is inadmissible unless it is so reliable, in view of the totality of the circumstances, as to prevent a substantial likelihood of misidentification."  United States v. Rutledge, 40 F.3d 879, 889 (7th Cir. 1994), rev'd on other grounds, 517 U.S. 292 (1996); see also Cossel v. Miller, 229 F.3d 649, 655 (7th Cir. 2000) ("An in-court identification that follows an impermissibly suggestive pre-trial identification is admissible if under the 'totality of the circumstances' the in-court identification was reliable."). In determining whether an in-court identification is reliable despite suggestive pre-trial identification procedures, the court considers the same factors mentioned above, i.e. the opportunity of the witness to view the criminal at the time of the crime, her degree of attention at the time of the crime, the accuracy of her pre-identification description, the level of certainty she demonstrates at the time of the identification, and the length of time between the crime and the identification.  Cossel, 229 F.3d at 655; Rutledge, 40 F.3d at 889.  "When the suggestiveness of the out-of-court identification has been conceded, the government bears the burden of proving by clear and convincing evidence that the in-court identification was based upon observations of the suspect other than at the prior, illegal identification[.]"  Cossel, 229 F.3d at 655; see also United States v. Wade, 388 U.S. 218, 240 (1967) (stating that the court should give the government "the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the [previous, unlawful] lineup identification").

## II.  FACTS AND BACKGROUND

On December 31, 2004, the Ozaukee Bank in Cedarburg, Wisconsin was robbed.  In

4

Case 2:07-cr-00030-LA   Filed 09/20/07   Page 4 of 13   Document 61

December 2005, authorities arrested Antonio Mann and charged him with the robbery.[2] Authorities learned that Mann and another person allegedly made large cash purchases at Stone's Jewelers in the months after the robbery. On October 2, 2006, Cedarburg Police Department Detective Scott Yanke traveled to Stone's and spoke with an employee, Jermaine Alexander. According to Yanke's report, Alexander indicated that he was familiar with Mann and another person who frequented the store with Mann, whom Alexander identified as "Alan." Alexander indicated that he sold jewelry to both men. Alexander viewed a photo of Mann, identified him as the person with whom he had dealt, and a photo of defendant, identifying him as Mann's companion Alan. Alexander indicated that his manager at the time, Mary Richter, had taken these two individuals over as customers, and that Richter now worked at Rogers and Holland Jewelers. Yanke proceeded to Rogers and Holland and spoke to Richter, who identified Mann and Alan as previous customers of her's at Stone's. She stated that they paid cash for their purchases. (Def.'s Mot. to Suppress Ex. I [R. 41-3] at 1.) Richter indicated that she believed Alan used the last name "Jones." She also recalled the nature of several of Mann and Alan's purchases, and that Alan had returned items he bought. She stated that the two came into the store together frequently, and that Alan was smaller in stature. On October 4, 2006, Yanke returned to Stone's and obtained records for the purchases of Antonio Mann and Alan Jones. (Id. Ex. I at 2.)

Yanke's report does not mention any photographic identification by Richter. Further, the parties assumed, based on the report, that Yanke presented Alexander with only one photo. They therefore agreed that the identification procedure was unduly suggestive. The dispute

---

[2]Mann has since pleaded guilty to the crime. United States v. Mann, No. 05-CR-323 (E.D. Wis.).

5

to be resolved at the hearing before the magistrate judge was whether there was an independent basis for any in-court identification by Alexander. (Def.'s Mot. at 1.) However, at the hearing, the government indicated that it had explored the matter further and learned that although Yanke's report gave the impression that Alexander had viewed just one photo (and Richter had made no identification), that was not the case. The government then presented testimony from Richter, Yanke and Alexander on the circumstances of the out-of-court identification of defendant as "Alan Jones" by both Alexander and Richter. (July 27, 2007 Hr'g Tr. at 3-4.)

Richter testified that in 2005 she worked at Stone's as vice-president of operations. (Id. at 9-10.) She stated that in her position she regularly dealt with customers and tried to develop relationships with them, which included attempting to learn things about their personal lives. (Id. at 10-11.) The government had Richter identify sales records pertaining to Alan Jones (Govt.'s Ex. 1), which indicated that she was the salesperson involved in several transactions with Jones, with Alexander and another employee, Linda Carter, handling others. Richter testified that Jones bought a watch and two pairs of diamond earrings, and exchanged some merchandise. (Hr'g Tr. at 13.) She stated that while she could not recall how often Jones came in before buying the watch, she did remember that he haggled with her over the price of the earrings and stated that he would think about it and come back. (Id. at 22-23.) She stated that she spent about one hour with Jones on each occasion he came to the store. (Id. at 23.)

Richter testified that she remembered Alan Jones based on their dealings. She indicated that he was very nice and was looking for a good deal on jewelry, and that he sometimes came in with Antonio Mann. She described Jones as a "not very tall," African-American man, thin and very well groomed. (Id. at 14.) She remembered Mann as an African-

6

American male, 5'7" to 5'9" tall, and always very pleasant. (Id.) She stated that Jones was shorter than Mann, maybe 5'1 or 5'2", about her height without heels. She indicated that she did some soft probing of Jones and learned that he had a girlfriend, who was expecting twins. (Id. at 15.)

Richter testified that she left Stone's in August 2006 and took a job with Rogers and Holland. She stated that in December 2006 she saw Alan Jones again, this time at her new store in another shopping mall. She stated that Jones walked by, saw her, and the two struck up a conversation. During this conversation, Jones stated that Mann had been arrested for stealing money and was trying to pin it on him. Jones later brought his girlfriend by, and she said hello to Richter. (Id. at 15-17.) Richter indicated that she recognized the woman Jones brought by as his girlfriend, the mother of the twins she mentioned earlier in her testimony. (Id. at 18.) In court, Richter identified defendant as Alan Jones based on their previous dealings. (Id. at 18.)

Richter testified that when the detective came to talk to her he stated that he was working on a criminal investigation, and he showed her some sales records like those presented at the hearing. The detective then indicated that he was going to show her some photographs and asked her to point out anyone she recognized. (Id. at 21.) Richter testified that she believed the photos were in "a plastic thing," six "on a thing", a total of about a dozen, and she had to flip through to look at them. (Id. at 23-24.) Richter was shown exhibit 2, photocopied pictures, which the AUSA (and later Yanke) stated were used in the display to the Stone's witnesses. (Id. at 25-26; 33.) Richter testified that she did not think exhibit 2 was what she was shown; she believed she was shown actual photographs of 4 x 6 or 5 x 7 size. (Id. at 24.) She further stated that the photos she was shown were in a different format than in exhibit

7

2, but the same two people she identified (Antonio Mann and Alan "Jones") were on exhibit 2. (Id. at 26-27.) However, Richter admitted that she could not be sure what the detective asked her to review in this case because she has been involved in several investigations in which law enforcement asked her to look at pictures, which were usually in a laminated covering. (Id. at 25; 27.)

The government called Detective Yanke to attempt to clarify the photo spread issue. (Id. at 29.) Yanke testified that he interviewed Richter and Alexander in October 2006 based on information he received that proceeds of the robbery had been spent at Stone's. (Id. at 30-31.) Yanke testified that he showed Alexander a series of five photographs, in the form of exhibit 2, one photo at a time, allowing Alexander ten to fifteen seconds to look at each. (Id. at 32-33.) Yanke stated that he then spoke with Richter, advising her that he was conducting an investigation of customers of her's. He asked her if she was familiar with Antonio Mann, and she stated that she was familiar with his purchases. (Id. at 34-35.) She also associated a second individual with Mann, whom she identified as Alan Jones. She described Jones as small in stature and stated that he frequented the store with Mann. Yanke testified that he then showed her the same series of photos he had shown to Alexander, the photos contained in exhibit 2. (Id. at 35-36.) He stated that he showed her the photos individually by placing them on a counter; Richter was not permitted to pick them up. (Id. at 37.)

Alexander testified that he sold several items to Alan Jones before the store manager, Richter, gave Jones a better price, and he then became her customer. (Id. at 40-41; 43-44.) Alexander described Jones as a short, friendly, African-American man. (Id. at 42.) He stated that Jones came in with another customer named Antonio, who was taller than Jones. (Id. at 44-45.) Alexander testified that defendant looked similar to Alan Jones, but he was unable to

8

make a definitive identification in court. (Id. at 45.) Alexander further testified that he could not recall whether the detective showed him one photo or multiple photos. (Id. at 46-48.) He stated that he had been approached by law enforcement and shown photos in several investigations in addition to this one. (Id. at 50-51.)

Based on Alexander's inability to identify defendant in court, the government has indicated that it will not call him as a witness at trial. (Govt.'s Resp. to Def.'s Mot. to Suppress [R. 55] at 8.) Therefore, defendant's motion as to Alexander is moot. I must, however, address Richter's out-of-court identification of defendant from the photo array and her anticipated in-court identification at a trial.[3]

### III. DISCUSSION

**A. Suggestiveness**

Contrary to what the parties initially believed based on Yanke's report, Yanke did not present the witnesses with a single photo, a practice that is generally considered unreasonably suggestive. See Funches, 84 F.3d at 254. Instead, according to the testimony of Yanke and Richter, he presented several photos.

Defendant concedes that if the court accepts Yanke's testimony, the photo display was

---

[3] I note that under Fed. R. Evid. 801(d)(1)(C) prior statements of "identification" are not hearsay. So long as the declarant testifies and is subject to cross-examination, the Rule allows the government to present evidence of a prior, out-of-court identification either through the witness/declarant or through a third party witness to the identification, such as a law enforcement officer. United States v. Kaquatosh, 242 F. Supp. 2d 562, 563 (E.D. Wis. 2003). I do not, at this point, know whether the government plans to introduce Richter's out-of-court identification of defendant from a photo through her and/or Yanke's testimony, or simply ask Richter to identify defendant in court. I therefore must consider the admissibility both of the out-of-court identification of defendant from photos and the expected in court-identification during trial. Of course, the relevant factors are basically the same for both determinations.

9

not unduly suggestive.[4] However, defendant points to the divergent testimony from Richter and Yanke on the nature of the photographic display. Yanke testified that he presented photocopies of five pictures, in the form of exhibit 2 (but not in a plastic case); Richter testified that she believed she was shown about a dozen actual photographs, not copies, in a plastic covering. Defendant contends that he cannot effectively challenge the identification without having access to the same photos shown Richter. He argues that "the procedure utilized compromises his due process right to challenge the identification procedure." (Def.'s Objections [R. 59] at 2.)[5] The argument fails.

I find that Richter's inability to recall the precise manner in which Yanke presented the photos was due to the fact that she has been shown photo spreads several times throughout her career as a jeweler.[6] It would not be reasonable to expect her to have perfect recall about each photo array. Under the circumstances, I find that Yanke would more likely have the clearer recollection as to the precise nature of the photo array he presented to Richter and Alexander. I therefore credit Yanke's testimony and find that exhibit 2 comprises the photos shown to Richter.[7]

---

[4]Although defendant does not challenge the form of the photo array contained in exhibit 2, I have nevertheless reviewed the photos and find that they are not unduly suggestive; the other persons depicted are not clearly distinguishable from defendant.

[5]In his post-hearing brief before the magistrate judge, defendant argued that if "Richter and Alexander are to be believed, the defendant's due process right to challenge the identification procedure has been compromised." (Def.'s Mem. [R. 53] at 4.)

[6]Alexander likewise testified that this was not the only time police showed him photos of possible suspects.

[7]Similarly, Alexander's inability to recall the identification process in this case can be chalked up to the fact that he has been asked to review photos in several other cases.

10

Defendant notes that Yanke's report says nothing about a photo array. However, I see no basis for rejecting Yanke's testimony just because his report was imprecisely drafted. Yanke wrote that Alexander viewed "a photo" of defendant and identified him as the customer, Alan Jones. This is not inconsistent with Yanke's testimony that he showed the witnesses photos one at a time. Further, Richter corroborated Yanke's testimony that Yanke showed the witnesses more than one photo. There is no evidence in the record that Yanke showed the witnesses just one photo, or engaged in any other improperly suggestive tactics in obtaining an identification. Therefore, for these reasons and those stated by the magistrate judge, I find that the identification procedure was not unduly suggestive.

Nor can I conclude that defendant has been deprived of his right to challenge the identification procedure. The government produced exhibit 2, the photos used in the display, and defendant was afforded an opportunity to cross-examine Yanke, Richter and Alexander about the procedure. There is no reliable evidence that other, undisclosed photos were involved.[8]

## B. Reliability

Even if the procedure Yanke employed was suggestive, I find that Richter's out-of-court identification was nevertheless reliable. I further find that her in-court identification of defendant at the suppression hearing was (and at trial will be) based on her familiarity with

---

[8]In any event, defendant fails to make any showing that, even under Richter's version of events, the photo array procedure was unduly suggestive. Richter stated that she believed she was shown more photos than Yanke says he provided, but that would likely decrease the suggestiveness of the procedure. There is nothing in the record to suggest that the photos Richter believes she saw were unduly suggestive, i.e. they depicted persons clearly distinguishable from defendant. Defendant had the opportunity to question Richter on the contents of the photos she recalls seeing.

11

defendant as her customer, Alan Jones.

Richter testified that she knew defendant as Alan Jones, her regular customer at Stone's. See Eleby v. White, No. 97-56782, 2000 U.S. App. LEXIS 2491, at *3 (9th Cir. Feb. 17, 2000) (finding identification reliable where the witness recognized the defendant "as a regular customer"). She helped him with several purchases and spent about an hour with him each time he came into the store. Thus, Richter had a clear opportunity to view defendant under non-stressful circumstances at the time he made the purchases of interest to law enforcement. Richter further testified that she wanted to establish an on-going relationship with her customers, so she made an effort to learn things about their personal lives. In this instance, Richter learned that Jones's girlfriend had twins by him. Richter's relationship with Jones continued after her employment with Stone's ended, as the two recognized one another and had a conversation at Richter's new job at Rogers and Holland. Jones went so far as to bring his girlfriend by to greet Richter at the new store and told Richter that Mann, his old shopping companion at Stone's, had been accused of stealing money and was trying to place blame on him. This evidence further demonstrates that Jones was far from a stranger to Richter. See Abrams v. Barnett, 121 F.3d 1036, 1042 (7th Cir. 1997) (finding identification reliable where the witness knew the defendant from the neighborhood); see also Wade, 388 U.S. at 241 n.33 (stating that the witness's past familiarity with the suspect is an important factor).

Richter's interest in this regular customer caused her to pay more attention to him than is often the case with witnesses to crime. Richter was able to describe Jones from her memory as a short, thin, African-American male. She stated that he was about her height, 5'1" or 5'2". I will take notice that according to his bond study, defendant is 5'2" tall. See Evans v. Smith,

54 F. Supp. 2d 503, 527 (D. Md. 1999) (finding identification reliable where the witness spent considerable time with the defendant and accurately described his short stature). Richter also recalled that Jones often came into the store with Mann, whom she recalled as a taller African-American male.

It is true that, according to the sales records, Richter's contacts with Alan Jones at Stone's Jewelers occurred between February and July 2005, over a year prior to the photo identification in October 2006. But under the circumstances, where Richter had developed a relationship with this customer, such passage of time is insignificant. See Lavernia v. Lynaugh, 845 F.2d 493, 500 (5th Cir. 1988) (upholding identification made fourteen months after the crime where other circumstances supported reliability). Indeed, Richter and Jones recognized one another at a different store, in a different mall, in December 2006. Richter thus had no difficulty identifying defendant as Alan Jones in court at the suppression hearing, and apparently no trouble picking him out of the photo array. Therefore, for all of these reasons and those stated by the magistrate judge, I conclude that any possible suggestiveness in the identification procedure did not and will not render Richter's in-court identification of defendant unreliable.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 56) is **ADOPTED**, and defendant's motion to suppress (R. 41) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 20th day of September, 2007.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

13