# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

   v.                                                 Case No. 07-CR-30

**ALAN SIMMONS**
        **Defendant.**

## SENTENCING MEMORANDUM

Antonio Mann's girlfriend, Jaclyn Schmidt, worked as a teller at the Ozaukee Bank in Cedarburg, Wisconsin. After Schmidt commented about the bank's lax security, Mann got the idea to rob the place. Mann shared the idea with his friend, defendant Alan Simmons, who recruited his cousin, Mark Campbell, to help. The three traveled to Cedarburg to scout the bank, then returned to attempt the crime. According to the initial plan, Campbell and Mann were to enter the bank using a key Mann copied from Schmidt's key-ring and take the money, while defendant Simmons acted as the lookout. That plan failed when the key would not turn the lock, so the three decided to abduct Schmidt from her apartment in the middle of the night, force her to go to the bank and open the vault.

At about 3:00 a.m. on December 31, 2004, Mann admitted Campbell, who was masked and armed with a handgun, to the apartment he shared with Schmidt. Campbell woke Schmidt, displayed the gun and stated that they were going to the bank. Schmidt advised Campbell that she could not open the vault without the access code of a second teller, so they waited until just before 7:00 a.m., when the bank opened. Campbell then directed Schmidt to drive to the bank, where they awaited the arrival of the second teller. When the other teller entered the

bank, Campbell grabbed her from behind, forced her to the ground and demanded her code. Schmidt then opened the vault, Campbell took $177,500 and fled with Mann, who was waiting in a truck outside. The two then returned to Milwaukee, where they split some of the proceeds with defendant, who had remained behind but stayed in contact with Mann by phone during the robbery.

Campbell and Mann pleaded guilty and testified against defendant at trial. A jury found defendant guilty of conspiracy, 18 U.S.C. § 371, armed bank robbery, 18 U.S.C. § 2113(a) & (d), and use of a firearm during a crime of violence, 18 U.S.C. § 924(c). See, e.g., United States v. Roberson, 474 F.3d 432, 433 (7th Cir. 2007) (discussing Pinkerton liability for the reasonably foreseeable crimes committed by accomplices in the course of a conspiracy).[1]

The probation office prepared a pre-sentence report ("PSR") in anticipation of defendant's sentencing, which recommended an offense level of 28 on the conspiracy and robbery counts: base level 20, U.S.S.G. § 2B3.1(a), plus 2 because the property of a financial institution was taken, § 2B3.1(b)(1), plus 4 based on Schmidt's abduction, § 2B3.1(b)(4)(A), and plus 2 for the loss amount, § 2B3.1(b)(7)(C). Coupled with a criminal history category of I, the PSR recommended a guideline range of 78-97 months on the conspiracy and robbery counts. The § 924(c) count carried a mandatory seven year consecutive sentence, as the firearm had been brandished during the commission of the robbery, see 18 U.S.C. §

---

[1] At sentencing, defense counsel indicated that defendant questioned the propriety of his being held responsible for the robbery and use of a firearm when he was not physically present at the scene of the crime, as well as the stacking of the § 924(c) charge on top of the armed robbery charge. As counsel conceded, under Pinkerton and its progeny, a conspirator can be held accountable for the crimes committed by his co-conspirators, as the jury found in this case. Further, Congress has specifically provided for consecutive sentences for armed robbery and use of a firearm during the same robbery. United States v. Larkin, 978 F.2d 964, 972 (7th Cir. 1992).

2

924(c)(1)(A)(ii), and the guideline sentence for such offenses is the minimum required by statute, see U.S.S.G. § 2K2.4(b).

Defendant objected to the abduction enhancement under § 2B3.1(b)(4)(A), arguing that Schmidt was actually a co-conspirator not a victim, and sought a minor role reduction under § 3B1.2 based on the fact that he was not physically present at the time of the robbery. The government sought an enhancement for obstruction of justice under U.S.S.G. § 3C1.1 based on defendant's attempt to solicit false testimony to explain his phone traffic with Mann during the robbery. After hearing testimony and the arguments of counsel, I resolved the guideline issues in the government's favor. I then imposed a total sentence of 15 years on consideration of the factors set forth in 18 U.S.C. § 3553(a). See United States v. Samuels, 521 F.3d 804, 815 (7th Cir. 2008) (stating that the district court must in imposing sentence first calculate the appropriate guideline range, resolving any disputed factual issues, then impose an appropriate sentence considering the factors set forth in 18 U.S.C. § 3553). This memorandum contains written reasons for the sentence imposed.

**I. GUIDELINES**

**A.      Obstruction Enhancement**

Under U.S.S.G. § 3C1.1, if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct or a closely related offense, the court will increase his offense level by 2. Application note 4 lists as an example of the type of conduct to which the enhancement applies "committing, suborning or attempting to suborn

3

perjury." U.S.S.G. § 3C1.1 cmt. n.4(b).

Section 3C1.1 requires specific intent to obstruct justice, and the government bears the burden of proving by a preponderance of the evidence that the enhancement is warranted. United States v. Ewing, 129 F.3d 430, 434 (7th Cir. 1997). In a case in which the obstruction is based on false testimony, the court should find all of the elements of perjury: falsity, wilfulness and materiality. United States v. Brimley, 148 F.3d 819, 823 (7th Cir. 1998). The testimony must be intentionally false, rather than a result of confusion, mistake or faulty memory. See United States v. Dunnigan, 507 U.S. 87, 94 (1993). The court should make specific findings, and not simply rely on the jury's guilty verdict.

In this case, the government proved that defendant suborned perjury by soliciting a woman named Shauntay Edwards to provide false trial testimony. See, e.g., United States v. Garner, 454 F.3d 743, 750 (7th Cir. 2006) (upholding the enhancement based on an attempt to solicit a false witness statement). Prior to trial, defendant identified Edwards as a potential witness in the case, but based on recorded jail phone calls the government came to suspect that defendant had solicited her through coercion and/or financial incentives to provide false testimony. Defendant ultimately did not call Edwards at trial, but an attempt to obstruct may also support the enhancement.[2] See United States v. Davis, 442 F.3d 1003, 1009 (7th Cir. 2006) ("Because the prohibited conduct of § 3C1.1 includes mere attempts to obstruct justice, a defendant need not be successful in order for the enhancement to apply.").

---

[2]The government believed that the defense did not call Edwards because it provided counsel with the recorded calls demonstrating defendant's deceit. In order to avoid intruding on privileged matter, I did not pursue the reasons why Edwards was not called. Defendant's attempt to suborn perjury supported the enhancement even though Edwards did not actually testify at trial.

4

At defendant's sentencing hearing, Edwards testified that defendant solicited her by letter sent to her boyfriend (and defendant's ex-brother-in-law), Demetrius Pugh, and during a three-way phone call involving defendant's ex-wife, Antoinette Pugh, to falsely testify that she had borrowed defendant's phone on the day of the robbery and called Mann about a broken date. This proposed testimony was significant because, at trial, the government presented phone records showing regular communication between defendant's phone and Mann during the course of the robbery.

Edwards testified that this proposed testimony was not true; she was not at defendant's house on the day of the crime, she did not borrow defendant's phone and she did not call Mann. Based on my observation of her demeanor, I found Edwards's testimony credible. Her testimony was further corroborated by the recorded jail calls presented by the government. During the calls, defendant directed Demetrius and Antoinette Pugh to provide Edwards with funds from defendant's North Shore Bank account; he asked Demetrius whether an unnamed female would make it to "the meeting," and Demetrius assured defendant that she would "be there even if I have to hog tie her"; defendant directed Antoinette to take "Shaun" to Boston Store or Macy's to get her hair cut, new make-up and clothing in preparation for the "prom"; defendant asked Antoinette whether Shaun would be able to "do it," to which Antoinette replied, "I know she can do it." In another call, defendant asked Demetrius whether he had received the letter, and Demetrius stated that he had. Defendant then asked Demetrius whether he understood, and Demetrius replied, "I got everything in perspective." In yet another call, defendant and Demetrius discussed "scratching each other's backs." (R. 84, Hruz Aff. ¶ 4-5.)[3]

---

[3]At sentencing, defense counsel asserted that "Shaun" was not Shauntay Edwards, but he offered no evidence in support of the assertion. Counsel also disputed the government's

5

I found the proposed testimony false and willfully so. There could be no mistake that defendant was on the phone with Mann during the robbery. Further, the proposed testimony would have been material at trial because, as noted, the phone records introduced by the government corroborated Mann's trial testimony as to his contacts with defendant during the robbery. Had defendant been able to present another explanation for the phone traffic, it could have significantly undermined Mann's credibility and possibly led to a different result. Therefore, I imposed the enhancement under U.S.S.G. § 3C1.1.[4]

## B.  Abduction Enhancement

Defendant objected to the 4 level enhancement for abduction to facilitate commission of the offense under U.S.S.G. § 2B3.1(b)(4)(A). This enhancement applies to robberies where "a victim was forced to accompany the defendant to another location." U.S.S.G. § 2B3.1 cmt. background; see also U.S.S.G. § 1B1.1 cmt. n.1(a) (explaining that the term "abducted" means that a victim was forced to accompany an offender to a different location). The Seventh Circuit has upheld the enhancement in cases in which the defendant forced a teller, at gun point, to

---

interpretation of the calls, but he offered no plausible alternate explanation. Counsel also noted that Edwards had twice come to his office in anticipation of trial and assured him that the proposed testimony was true. I found Edwards's testimony at the sentencing hearing – that defendant fed her this phony story – credible.

[4]Defendant objected to my consideration of the § 3C1.1 enhancement because the government failed to timely object to the PSR. Defendant noted that the government was aware of the issue with Edwards since shortly before trial. The government explained that, despite consistent efforts, it was first able to obtain an interview with Edwards just three days prior to sentencing. It was during that interview that it was able to confirm its suspicions about her proposed testimony. The government filed its sentencing memorandum containing its position on the enhancement the day after the interview, which was two days before sentencing. I found that the government had established good cause for not objecting sooner under Fed. R. Crim. P. 32(i)(1)(D), but I nevertheless offered defendant an adjournment of the sentencing so he could research or investigate the matter further. Defendant declined the invitation.

6

go from outside into the bank. See United States v. Taylor, 128 F.3d 1105, 1110-11 (7th Cir. 1997) (citing United States v. Davis, 48 F.3d 277, 279 (7th Cir. 1995)); see also United States v. Jones, 950 F.2d 1309, 1316-17 (7th Cir. 1991) (applying the enhancement based on co-conspirator liability where the evidence showed that the conspirators planned to abduct the bank manager in order to get the keys to the bank vault). The government bears the burden of proving that such guideline enhancements apply by a preponderance of the evidence. See United States v. Hines, 449 F.3d 808, 816 (7th Cir. 2006).

In this case, the PSR based the enhancement on Schmidt's abduction. As noted, Mann provided Campbell with a gun and admitted him to Schmidt's apartment. Campbell then directed Schmidt to drive to the bank, where he accosted another teller to obtain her security code and took the money. Defendant argued that the enhancement should not apply because Schmidt was actually a co-conspirator, not a victim. She provided information to Mann about the bank's lax security, which gave Mann the idea to commit the robbery in the first place, and she later received robbery proceeds. She also opened the car door for Campbell once the two arrived at the bank.

Although the circumstances of the case raised some questions about Schmidt's conduct, I found that she was a "victim" abducted to facilitate the offense on December 31, 2004. I accepted that Schmidt made inappropriate statements to Mann about the bank's security, but there was no reliable evidence that she was involved in the actual planning of the robbery, that she knew in advance that the defendants were planning to commit the crime on December 31, or that she voluntarily went to the bank that day. As the government noted, she did open the car door for Campbell at the bank (he could not open it from the inside because of a child safety lock), but she did so only after Campbell tapped on the window with his gun.

7

Campbell did not state that Schmidt knew he was coming, and Mann denied that she knew. Mann apparently did state at one point during an early debrief that Schmidt was involved in some initial discussions about the robbery, but he later recanted that. Mann at no point stated that Schmidt knew he and Campbell were coming on December 31 or that she willingly accompanied them to the bank that day. Mann further stated that while he gave her robbery proceeds as repayment for a debt, she did not know of the source of the money. Schmidt consistently denied prior knowledge or having any idea that she would be abducted from her home. Thus, given her ill-advised comments about bank security, it may not have been a surprise to her, in hindsight, that Mann committed this crime;[5] but that did not mean that she was not a victim on December 31 when Campbell confronted her in her bed at gun point and ordered her to drive them to the bank.

But I did not have to just take the word of Campbell, Mann and Schmidt on this issue. The circumstances supported their statements. Had Schmidt been in cahoots with Mann, Mann would not have sent Campbell into her apartment armed and masked. Further, as the government noted, the timing of the abduction also supported the notion that she did not know. Mann and Campbell went to Schmidt's apartment in the middle of the night, intending to go to the bank then, before it opened. But Schmidt told them that she needed the code of a second teller to open the vault. As a result, Campbell and Mann had to wait several hours until just before the bank opened. During this time, Mann drove around town, which apparently aroused some suspicion. If Schmidt had been in on the plan, she would have told them to come later,

---

[5]Schmidt initially told the police that she had been abducted from her car, not her apartment. The government believed that she may have said this because Mann was her live-in boyfriend, and her apartment bore no signs of forced entry.

8

when the plan could be effectuated. For all of these reasons, I found that the enhancement applied.

## C.     Minor Role Reduction

Defendant also objected to the absence of a minor role reduction under U.S.S.G. § 3B1.2. That guideline provides a range of adjustments for a defendant who plays a part in committing an offense that makes him "substantially less culpable than the average participant." U.S.S.G. § 3B1.2 cmt. n.3(A). The defendant bears the burden of demonstrating by a preponderance of the evidence that he is entitled to a reduction. United States v. Sandoval-Vasquez, 435 F.3d 739, 745 (7th Cir. 2006).

Defendant argued that he should receive an adjustment because he was not present at the scene of the crime, nor did he assist in the getaway. He claimed that at most he encouraged the robbery and offered commentary, but he took no active role.

Defendant failed to demonstrate entitlement to a role reduction in this case. The evidence at trial showed that defendant was deeply involved in the planning of this crime; he recruited the gunman, eventually settling on Campbell after rejecting other candidates; he introduced Campbell to Mann, as they did not know each other previously; and he accompanied them on a scouting mission to the bank in Cedarburg and acted as the lookout during the first, aborted attempt. Although he remained in Milwaukee during the actual commission of the crime, he stayed in regular phone contact with the others and later received a large cut of the proceeds, $30,000 total. Campbell was apparently glad to give defendant more because if not for defendant he never would have participated in the robbery. Ultimately, although Mann first came up with the idea based on what he heard from Schmidt, it appeared that defendant actually occupied the leadership role after he became involved. The fact that

9

defendant allowed his co-defendants to do the heavy lifting did not make him a minor participant.

Courts have regularly denied role reductions based on similar arguments and under similar circumstances. See, e.g., United States v. Mitchell, 178 F.3d 904, 910 (7th Cir. 1999) (denying reduction where the defendant did not plan the robbery and ultimately did not execute it); United States v. Redig, 27 F.3d 277, 281-82 (7th Cir. 1994) (denying minor role reduction where the defendant provided information but did not actually participate in the execution of the robbery); see also United States v. Spears, 235 F.3d 1150, 1152 (8th Cir. 2001) (denying reduction to the lookout); United States v. Hafiz, 129 F.3d 1011, 1013 (8th Cir. 1997) (denying reduction to the getaway driver); United States v. Lowery, 60 F.3d 1199, 1202 (6th Cir. 1995) (denying reduction to a getaway driver who failed to participate in the actual robbery of a bank, but nevertheless actively participated in the development of the criminal scheme).

**D.     Conclusion on Guidelines**

Defendant made some additional factual objections, but they did not affect the guidelines. Because I concluded that they also would not affect the sentence, I made no findings on them under Fed. R. Crim. P. 32(i)(3). Therefore, I adopted a final offense level of 30 on counts one and two; a criminal history category of I; and a range of 97-121 months imprisonment on counts one and two, with 84 months consecutive on count three. I turned then to imposition of sentence under 18 U.S.C. § 3553(a).

## II.  SENTENCE

**A.     Section 3553(a)**

In imposing sentence, the district court must consider all of the factors set forth in §

10

3553(a).  United States v. Harris, 490 F.3d 589, 593 (7th Cir. 2007), cert. denied, 128 S. Ct. 963 (2008).  Those factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  The statute requires the court, after considering these factors, to impose a sentence that is "sufficient but not greater than necessary" to satisfy the purposes of sentencing – just punishment, deterrence, protection of the public and rehabilitation of the defendant.  Id.

Although the guidelines should be the starting point and the initial benchmark, Gall v. United States, 128 S. Ct. 586, 596 (2007), the district court may not presume that the guideline sentence is the correct one, Rita v. United States, 127 S. Ct. 2456, 2465 (2007).  Rather, after accurately calculating the advisory range so that it "can derive whatever insight the guidelines

11

have to offer, [the district court] must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence." United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007).

**B.  Analysis**

    **1.  Nature of Offense**

As discussed above, in December 2004, defendant and Mann hatched the plot to rob the Ozaukee Bank, where Mann's then-girlfriend worked as a teller. Defendant recruited his cousin, Campbell, to participate. The three went to Cedarburg to scout the bank and later made an unsuccessful attempt, during which defendant acted as a lookout. When that plan failed, the three elected to kidnap Schmidt and force her to drive to the bank to wait for another teller who had the second access code needed to get into the vault. Defendant did not accompany Mann and Campbell this time, apparently due to child care problems (real or alleged), but he stayed in contact with Mann by phone. When the second teller arrived at the bank, Campbell grabbed her from behind, pulled her to the ground and held a gun to her chest, demanding the access code. Schmidt then opened the vault, and Campbell took $177,500 and fled with Mann, who was parked outside. They returned to Milwaukee and split some of the money with defendant.

    **2.  Character of Defendant**

Defendant was twenty-nine years old and had several prior contacts, including a 1997 municipal obstructing offense; a 1998 possession with intent to distribute cocaine case, for which he was placed on probation; and two municipal disorderly conduct offenses from 2004 and 2005. He nevertheless fell in criminal history category I because only the drug case scored

12

under the guidelines.

Defendant appeared to have had a pretty good childhood, with two supportive and involved parents. His mother died during the pendency of this case, which was no doubt difficult for him.[6] Defendant's father and sister made positive statements about him to the PSR writer and at the sentencing hearing. Prior to his arrest, defendant was engaged to Bonnie Bruno, the mother of two of his children, but the status of that relationship was not clear, and she stated the kids had to come first.

Defendant was married to Antoinette Pugh from 2001 to 2005, and that union produced two children, ages six and four. Defendant owed over $7000 in back child support until just before sentencing, when a state court judge seized funds defendant had in a bank account that the government discovered in this case through defendant's recorded jail calls.[7] Antoinette made some positive comments about defendant's ability as a father, as least before the divorce, but it was clear from her statements to the PSR writer and from her testimony in the state court support proceeding that defendant had not provided for his kids financially. He graduated high school, but his employment record was pretty sparse. I also found it telling that defendant spent his share of the robbery proceeds on expensive items for himself, including jewelry and electronics, as discussed during the trial,[8] rather than supporting his kids. He also sought to use the $25,000 discovered in the North Shore account to hire yet another new

---

[6] I did direct the Marshal to take defendant, who was detained pre-trial, to the funeral home for a visitation. (R. 24.)

[7] This was the same account defendant used in connection with the Edwards testimony.

[8] In order to link defendant to the crime, the government presented testimony from several "expenditure" witnesses, who testified as to defendant's expensive purchases in the weeks after the robbery.

13

lawyer,[9] rather than pay child support. The only amount he paid was the minimum $1000 "purge" payment needed to lift a warrant and allow his possible release, if the federal case had gone his way.

Defendant appeared to have no significant substance abuse issues or other correctional treatment needs, aside perhaps from some vocational training so he could find legitimate work. However, it appeared that defendant had little inclination to find a legitimate source of income.

### 3. Guidelines and Purposes of Sentencing

The guidelines recommended 97-121 months on counts one and two, and the statute required 7 years consecutive on count three. Under all of the circumstances, I found a total sentence of 15 years sufficient but not greater than necessary. This was a terrible crime, which involved the home invasion and abduction of one teller in the middle of the night, and a second teller who was grabbed from behind, pulled to the ground and had a gun held to her chest and head. The second teller suffered serious and lasting effects from the crime. The defendants made off with $177,500, making this one of the largest robberies in the history of the State of

---

[9] Defendant went through several lawyers before trial, and sought to hire another after trial with the funds the government discovered in the North Shore account. I froze the funds pending resolution of the state child support proceedings and in order to ensure that they were available for restitution (R. 85), which is mandatory in a case like this. See 18 U.S.C. § 3663A. The state court took about $16,000 of the nearly $25,000 in the account. Defendant asked that the rest be released so he could hire a new lawyer (R. 101), but I denied that request at sentencing and ordered that the balance be allotted to restitution. Defendant had a lawyer ready and able to represent him during the remainder of the proceedings in this court (see R. 96), and based on his financial status defendant qualified for appointed counsel to handle his appeal (see R. 6). See Barber v. Birkett, 276 F. Supp. 2d 700, 710 (E.D. Mich. 2003) (finding no denial of right to counsel of choice where court refused to return seized funds held for restitution and defendant had appointed counsel); cf. United States v. Real Property Located at Incline Village, 976 F. Supp. 1327, 1358 (D. Nev. 1997) ("It is therefore clear that a claimant may not insist on using assets as to which the government has established probable cause to declare forfeit to obtain counsel of choice.").

14

Wisconsin.

Defendant pointed out that he did not personally enter the bank or hold the gun. But he knew a gun would be involved, and he participated in the planning of the crime. In fact, it appeared to be me that although defendant did not get his hands dirty, he really was the linchpin of this conspiracy. Mann originally came up with the idea, but the impression I got of Mann was that he would need a lot of help to pull something like this off. Once he brought in defendant, defendant basically took over, recruiting the gunman and keeping things moving forward.

The only possible mitigating factor I saw, in regards to the guidelines recommendation anyway, was that the 4 level enhancement under 2B3.1(b)(4)(A) slightly overstated the severity of the offense. This was not a situation in which a teller was abducted by total strangers, as I have seen in other cases, and it was her statements about bank security that first put the idea in Mann's head. The enhancement was properly applied, for the reasons stated earlier, but under § 3553(a) I took into account Schmidt's relationship to the robbers when determining a sentence that was sufficient to provide just punishment. See United States v. Wachowiak, 496 F.3d 744, 753 (7th Cir. 2007) (stating that the court may, under Booker, elect to give different weight to a factor covered by a guideline adjustment). Nevertheless, the crime was extremely serious, and defendant's role in it significant, making a lengthy prison sentence necessary to provide just punishment. See 18 U.S.C. § 3553(a)(2)(A).

I also concluded that a lengthy term was needed to protect the public, deter defendant and promote respect for the law. See 18 U.S.C. § 3553(a)(2)(A), (B) & (C). The impression that I got through this proceeding was that defendant was very calculating; that he used others to get what he wanted, like Andrea Johnson, whom he persuaded to drive him to Cedarburg

15

under the guise of looking for an apartment when he actually wanted to scout the bank; that he showed no remorse for his actions; and that he was not easily deterred. For example, even while detained in this case it appeared that defendant continued to operate a prostitution business. As I discussed in denying defendant's various bond motions, it certainly appeared that defendant managed a teenaged prostitute from behind bars. I analyzed his recorded jail phone calls and how they demonstrated probable illegal activity in those decisions. Defendant secured affidavits from others to try to present an innocuous explanation for his relationship with the girl, but as I explained in my bond decision, those affidavits were, under the circumstances, less than persuasive. (See R. 47, 67.) As discussed in determining the guidelines, defendant also attempted to suborn perjury at his trial in this case.

The government asked for a high end sentence. But for the possible overstatement caused by the § 2B3.1(b)(4) enhancement, I likely would have imposed such a sentence. However, given the overstatement, I imposed a sentence around the low end, which under all of the circumstances was sufficient but not greater than necessary. Any lesser sentence would have depreciated the seriousness of the crime and failed to protect the public, for all of the reasons stated herein. Defendant had never been to prison before, and I often find that a lesser term is sufficient to deter someone who has not previously done time, but given my evaluation of defendant's character, I found this sentence necessary.

Defendant asked me to impose a sentence consistent with those received by Mann (139 months) or Campbell (100 months). But Mann and Campbell both pleaded guilty and cooperated with the government. Therefore, they were not comparable to defendant, who went to trial, attempted to suborn perjury and accepted no responsibility for his actions. See, e.g., United States v. Pisman, 443 F.3d 912, 916 (7th Cir.), cert. denied, 127 S. Ct. 413 (2006)

16

(explaining that a lower sentence for one defendant based on a decision to plead guilty and cooperate does not create unwarranted disparity compared to the non-cooperating defendant). I also read the letters defendant solicited from the jail chaplains, which discussed defendant's involvement in bible study while detained in this case, but I suspected that defendant was using them like he used others. The letters did not convince me to impose a lesser term.

### III.  CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for 60 months (the statutory maximum) on count one and 96 months on count two, those sentences to run concurrently, and 84 months on count three to run consecutive to the sentences on counts one and two, for a total of 180 months. I further ordered him to make restitution to the bank and its insurance company in the amount of $177,500, joint and several with Mann and Campbell, and to apply the remaining funds in the North Shore Bank account to restitution and to participate in the Inmate Financial Responsibility Program while incarcerated. See United States v. Sawyer, 521 F.3d 792, 795 (7th Cir. 2008). Upon release, I ordered him to make restitution payments of not less than $100 per month and to serve five years of supervised release. I selected the maximum supervision term to ensure that defendant paid restitution and found legitimate work. The conditions of supervision appear in the judgment.

Dated at Milwaukee, Wisconsin, this 12th day of May, 2008.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

17